Good morning, counsel. Good morning, Your Honor. May it please the Court. Jennifer Cooper, on behalf of Petitioner Appellant Shiraz Lakhani. I, along with my co-counsel, Bimara Wante, are certified law students at Loyola Law School's Ninth Circuit Clinic. Today I will be addressing Paternal Revenue Code 165D as it applies to Mr. Lakhani's case, and Bimara will be discussing the amendment to 165D and why remand is required here. We would like to reserve three minutes for rebuttal. Just let me ask you, as a procedural matter, how's that going to work? You're both going to have the rebuttal time, or one of you is? Mr. Wante will be handling the rebuttal. Okay. Very well. This case presents an issue of first impression within this circuit, the issue being whether in parimutuel wagering the portion of the vet known as the takeout that the house collects irrespective of the outcome of the wager is subject to Section 165D. It is our position the tax court erred in finding that the raised tax takeout is subject to 165D. Now, 165D is the provision that says that your wagering losses have to be offset against your wins, is that? Yes, Your Honor. Your wagering losses shall only be deductible against such wagering gains. And so Section 165D deals with losses from wagering transactions and gains from wagering transactions. Both parties rely on the- And what you want to do is what? What he wants to be able to do is what? Mr. Loncani wants to deduct the raised tax takeout as an ordinary and necessary business expense of being a professional gambler. The raised tax takeout, akin to a transaction fee, would fall under 162A, which allows for deductions of ordinary and necessary business expenses, so long as the raised tax takeout is not found to be a loss from wagering transactions. Counsel, how do you reconcile your position with the Knitsburg case, the reasoning and the facts of Knitsburg? How can the takeout be deductible? In Knitsburg, this Court dealt with the issue of whether shills, which were contracted on behalf of the casino, fell under losses from wagering transactions. In that case, the shills were employed by the casino, and so they were engaging in the wagering transactions, and so the Court found that it was held to be losses from wagering transactions. The reality is, in both cases, in your case, the track needs to take the money, pay the expenses, and then make distribution. So that's where the takeout comes from. In the shill situation, in order to make the game work, you had to have these people there or nobody would play. In both cases, though, they were expenses that the racetrack or any other gambling situation might have. What's the difference? I know technically they're doing different things, but what's the difference logically? My understanding from the difference logically would be in the Knitsburg case, that was dealing with the casino wanting to deduct the losses, whereas this case, it's dealing with an individual better, who's not acting on behalf of the casino, who wants to deduct the takeout as a fee for placing a wager. Well, the takeout is taken from the money that is wagered. Isn't that correct? Yes, Your Honor. So that's where I kind of get stuck. How can this not be a wager if it's from the money that is wagered? Your Honor, our position is that it's not part of the wager because it's a fixed event. Every time Mr. Lincani places a bet at a racetrack, he is required to pay 15% for a conventional bet, 16.75% for an exotic bet. And so that is a fee that could be separate from the actual wager itself. So if Mr. Lincani bets $100 and he's subject to a 20% takeout, that $20 is not ever paid back to the winning bettors. It is collected by the track to pay for their operating facilities. But how is that any less a gambling expense? Suppose there's a fee to enter the casino. On a tour of Europe once, they entered a fancy casino in Baden-Baden, Germany, and they charged you to get in. Now, how is that any, if it's a commercial transaction, I was there as a tourist, but if it's a commercial transaction, isn't that part of the expenses connected to gambling? Yes, Your Honor. And under Mayo, those expenses are deductible under 162A because those non-wagering expenses do not fall under Section 165D as losses from wagering transactions, as the statute applies to Mr. Lincani's case. So in parimutuel wagerings, just for some background, the house is not a participant in the event, and the house takes the takeout irrespective of the outcome of the bet. And so this court, in a 1985 decision, Boyd v. United States, dealt with whether a professional poker player's contractual share of the takeoff was a gain from wagering transactions. This court held that it was not a gain from wagering transactions because it was not the direct result of a wager entered into by the professional poker player or the casino. Rather, the takeoff in poker was a fee the casino charged the players for use of the casino's facilities. Did we address the deductibility of Boyd's takeoff in that case? I didn't think we did. Did we? You didn't address the deductibility of the takeoff in that case, but the professional poker player was entered into a contract with the Golden Nugget Casino to play in poker games, and he was able to earn some of the takeoff revenue that the casino earned as part of playing in these poker games. Well, that's a different issue, is it not, than the one you brought to us? You're talking about the deductibility of the takeout. That other has more of an income factor to it, does it not? Yes, Your Honor, but for symmetry, we're trying to say that if the takeoff in poker in Boyd was not a gain for the casino, but rather a fee the casino charged for facilitating the wagering activity for an individual better, that same fee would not be a loss from wagering transactions. So because the takeout is separate from the direct cost of the wager and not as similar as a transaction fee, this court should find that the takeout falls outside of Section 165D.  Thank you. Good morning. Good morning, Your Honors. May it please the Court, Bulmara Huante on behalf of Petitioner Appellant Mr. Lancani. As my partner noted, I will be addressing two issues. The first is the recent amendment to Section 165D, and the second are the procedural issues of our case. If I may, I'd like to begin with the recent and temporary amendment to Section 165D, Your Honors. In December, Congress elected to, for the first time, define what losses from wagering transactions within the Section 165D means. And there, Congress elected to foreclose the definition and include those costs which Mayo had held were incidental to a gambling expense. And now, as the law stands currently, that only affects, it only addresses every cost incidental to a wager. Let me just ask you this. Perhaps I didn't see this, but this is part of the omnibus tax bill, right? That's correct, Your Honor. And did you send us a 28-J letter or supplemental brief that addressed this? Yes, Your Honor. And we also contacted the Commissioner to notify him because this took place in December right after principal reliefs were submitted. So we figured out this was the best approach to do so. I confess I didn't see it. I apologize for that. But will you just give me a mini-description again of what exactly the change was? Certainly, Your Honor. In losses from wagering transactions was undefined, and this Court recognized as such in void. Mayo recognized as such. Congress, in this instance, limited losses from wagering transactions to include all costs associated with a wager. So where Mayo held that a cost incidental to a wagering expense was not limited by 165D, the new amendment makes or effectively overrules Mayo. And any cost incidental to a wager is now limited by 165D. Now, it's important to note that that amendment is ‑‑ there is a temporal limitation to that amendment, that it's only effective beginning December 31, 2017, and lasts through January 1, 2026. So that doesn't affect this case then? That's correct, Your Honor. It is relevant for two instances. The first is that the fact that the Congress identified Mayo to be the law as it stood and chose to change it indicates that Mr. Loncani's interpretation of losses from wagering transactions is relevant and reasonable in this instance. Okay. So the amendment would be ‑‑ would affect you adversely if it were to apply. That's correct. And so your argument is that Congress must have recognized that you were right, therefore it decided to do something that would be adverse to your position, is that? That's correct, Your Honor. Interesting. Unusual argument. But, and again, to point out Justice Schroeder's question here, the issue is that Congress identified the law as it stood and recognized that Mayo was the law effective and applicable to Mr. Loncani, but now foreclosed that interpretation. Did Congress refer to the Mayo decision in the legislation itself? No, Your Honor. And, in fact, the fact that Congress didn't elect to make this a clarifying amendment and the fact that this is a temporary amendment is interesting because it changes the law, but it only does so for 10 years. I understand. But what I'm trying to understand is you said that they recognized Mayo as the law. I ask you whether that's included in the language. You said it's not. Where are they talking about Mayo? They didn't talk about Mayo, Your Honor. This is sort of a logical conclusion reached given. So you've deduced that that's what Congress must have intended. Yes, Your Honor. This is our. Another interesting argument. And if I may move to the evidentiary issue at hand. As a matter, both the Commissioner and Mr. Loncani both agree that if this Court were to agree with us and decide that the takeout percentage that a track retains when Mr. Loncani enters in a bet is not limited by 165D, then the proper course of action is for this Court to remand. And we ask that this Court exercise its discretion and instruct the trial court to allow Mr. Loncani to allow him to present evidence that would arrive to the proper takeout applicable to his bets throughout. And that's because at trial and on pages 87 of the record, the tax judge instructed the parties and communicated to the parties that there is no dispute that a takeout exists. The fact of what percentage applied to Mr. Loncani could easily be determined, and the Commissioner on record agreed to work with Mr. Loncani. Mr. Loncani. Forgive me, Counsel. I thought that the Counsel said that the Commissioner was going to do that, but the Commissioner never ended up doing it, right? That's correct. So there was no concession by the Commissioner. They may have had a chat outside and talked about it, and your Counsel must have thought that's what was going to happen, but it didn't happen, right? It didn't happen. And the fact that Mr. Loncani was a pro se client, and on the record he indicates during that conversation and exchange with the judge that he had all the information necessary to arrive to that takeout percentage, so he had some reliance on this statement. And when he attempts to communicate with the Commissioner, that reliance is retracted, and the Commissioner then on post-trial briefings challenges Mr. Loncani's position by asserting that he never provided any factual evidence. Well, let's assume for a minute that Mr. Loncani was permitted to provide this information. It doesn't really help, though, does it, if the tax court interprets the law in the way that it did. It's almost irrelevant because whatever it is, however much it is, he can't deduct it, right? That's correct, Your Honor. However, the fact that, again, Mr. Loncani being a pro se client, and Mr. Loncani was at least attempting to bring in this evidence as best as he could and then was foreclosed from that opportunity and that very use against him in post-trial briefings. Perhaps you didn't understand what I was saying. I'm saying that assume for a moment that he had been permitted to bring in the evidence. Whatever it might have been, if the tax court interpreted the law as it did, then it would be irrelevant because it would not be admissible in any event because he can't deduct it, whatever its amount, right? That's correct, Your Honor. That's why our position is that if this court were to agree that the ticket percentage, in fact, is not limited by 165D, Mr. Loncani should be afforded that opportunity to present evidence on remand. Do you want to save any of your time? You have a minute and 15 seconds. Yes, Your Honor. Thank you. Thank you. Well, we'll hear from the government. An always popular party. We show up in a lot of these cases. Good morning, Your Honor. My name is Ivan Dale, and I represent the Commissioner of Internal Revenue. So Shiraz Loncani bets $100 to win on a horse. If that horse wins, he gets his entire $100 back plus a payout. If that horse loses, he loses the entire $100. That's true no matter if the takeout is 15% or 17%, no matter if the racetrack forgets to apply the takeout percentage or miscalculates it or doesn't follow the law or because of an overwhelming favorite one, there was no takeout, whatever the takeout is in that scenario, Mr. Loncani, the outcome of Mr. Loncani's wager is entirely contingent on the performance of the horse. Well, it is and it isn't in at least one respect, which is that if you're doing this with a group of friends, you're having a party for the Kentucky Derby and a bunch of people come over and you throw money into a pot. In the end, all the money gets paid out. But if there's a house, or in this case the track, not all the money gets paid out. It is at least conceptually not entirely unlike the poker room where you have to pay a fee for paying. And the fee gets, before at least this recent amendment, which I confess I also was unaware of, it's treated differently for tax purposes, doesn't it? Well, suppose the track, suppose Churchill Downs, instead of running a paramutual pool, ran it so that we're going to divide up all the money that's in the pot, but to play, to place a bet, you've got to pay us a fee of $50. Pre-Mayo and post-amendment, that would still be a gambling loss. Right. After Mayo, which was decided in 2011, the IRS acquiesced in 2012. If we follow the tax court's decision in Mayo, which the IRS has said it's not going to argue against anymore, then a separate transaction in the form of a fee might, if it otherwise satisfies deductibility requirements, be treated as a separate expense of a professional gambler. And that would only be true in the case of professional gamblers. Let me understand the hypothetical. The hypothetical is the fee is paid before you bet. In that case, there's two transactions. You went to the track and you paid, say, an entry fee to get into the track, $10 ticket to enter. Then you make a wager, $100 on a horse to win. Two transactions occurred. One was the entry fee. There was no chance of recovery, nothing to be gained or lost. And the second was the wager. The wager itself is limited by 165D, no matter the state of the law. The entry fee, if you follow Mayo, could be considered a separate expense if the person paying the entry fee were a professional gambler. And it would be something like, you know, buying a brochure or his travel costs to get to the track. In Mayo, do you get the fee back if you win the bet? In Mayo, do you get the fee? I'm not sure I understand your question. In this situation, if you win, what is this? If you win your bet, what happens to the fee? My hypothetical was trying to track Mayo, so you wouldn't get the fee back, because Mayo, they're talking about expenses and so forth. I was trying to simplify. Correct. Mayo talked about things like, actually, I think one of the items in Mayo was entry fees. That's true. Right. So those entry fees in Mayo, under Mayo, were not limited by 165D. Right. Because it had nothing directly to do with the wager. Correct. It was a transaction. It wasn't doing business for the professional gambler to enter where he could make the wager. Correct. Here, the taxpayer has made a wager. In my example, $100 wager on a horse to win. Even the California Code defines that as the wager. The California Code defines, it imposes takeout on the total amount collected in a parimutuel pool. And parimutuel pool is defined as the total amount of wagers. So even under the California Code, the wager is the $100 bet. Mr. Licani doesn't pay the takeout. The takeout is imposed on the track. Well, he pays it in the sense when he wins. But the takeout in a parimutuel pool has the effect of shifting the admission or entry fee burden entirely to the winners because it takes it out of the pool to be distributed. So by his argument, which is a construct, and that's your main point, by his argument, his winnings are depleted or diminished because the winnings are cut by the amount of the takeout. If he loses, he loses. But if he wins, instead of getting back $100, he gets back 85 because the house has taken 15 percent. And that's inherent in every gambling transaction. The house is always going to get its take. The casino has to make money. It's just the way that it works. And you could have an arrangement where they take out a percentage, but they could also have an arrangement where they take out by paying money to get into the door. But the structure of it appears to have an impact. And I guess I'm searching for why should it have an impact. If the service accedes to Mayo and recognizes that some of those things can be treated as expenses, could the same scenario be applied in a track situation? Well, and the simple reason is we are applying the term losses from wagering transactions. All right? So here we have one transaction, 8-Bet. Is it a wagering transaction? Yes, it's a wagering transaction. The California Code says it is. He either loses or wins that entire amount. The take doesn't come into effect unless he wagers. In these other expenses where he has to pay to get into the casino, it depends on whether he comes into the number of people that come into the casino, I guess, not the amount of money that's wagered. Well, yeah, if there's an entry fee to get into the racetrack, he would be paying that whether or not he made a wager. Right. If he's already paid it. If there's a fee up front to pay before you wager. It's not part of the wager. Right. And you would treat, for example, the cost of getting to the racetrack like an airplane ticket or a cab fare or whatever, if it's a professional gambler. Under Mayo, that's deductible because that's nothing to do with a wager, right? Under Mayo, I want to be real careful here. The service didn't agree with Mayo going in. They acquiesce. So they're going to allow taxpayers to rely on that decision. And they're not going to go in and argue in court that the travel expense would not be part of the fee of a professional gambler. They're no longer going to argue that that's limited by 165. They're not saying hold the Mayo. Sorry. And when Congress, at the end of last year, passed the Omnibus Tax Bill, and I do want to say it was in their reply brief. So we had notice of the argument. Okay. Good. When they passed that, they passed, and I can get you the specific language, but it's something to the effect that it effectively overrules Mayo when it says that the term losses from wagering transactions include all the expenses incurred as part of that gambling activity. Congress passed that, and the conference report explained that it was intended to clarify the law. So Congress understood that that was the law, and Mayo was perhaps wrongly decided. It hasn't been, Mayo hasn't been adopted by a court of appeals either. So that's why I'm being a little bit careful. I'm not too keyed on Mayo, especially in light of the legislative history. But as it stands now, the service has not changed its position. But so far as this case is concerned, Mayo really applies. As far as this case is concerned, if Mr. Licani could identify an expense of the type identified in Mayo, we would not be arguing that it was limited by 165D. But your position is that this is a wagering loss. His bet is a loss from a wagering transaction. I think that maybe to the extent that the amendment is relevant, it's, you know, what he's asking for is an expansion of Mayo now to include some part of a wager that might be attributable to what the track later on takes out before it does its payout. But that amount is not fixed. The amount is not paid by Mr. Licani. It's not fixed at the time he places the wager. It is based on the outcome of the case. If an overwhelming favorite wins in the race, the takeout is going to be less effectively. Well, the reality is since only Mr. Licani's winnings are affected by the takeout, and since the amount of the winnings is reduced by the takeout, hasn't he in effect already received the benefit of what he's talking about? Because he doesn't, if it's a win, he doesn't have to take that into income. Now, he wants the other side, which is if he loses. But if you consider it on the winning side, in effect it's already deducted because he doesn't get as much in winnings, right? I think that's fair, and it's also useful to point out that the way he reports his winnings is not necessarily consistent with his theory. In other words, so if you go in with, if you make two bets, two $100 bets, one you double your money and the other you lose, everybody would consider that a wash. But under Mr. Licani's theory, the 15% takeout, if that's what it ends up being, came out of at least the winning bet, but I think his argument is it came out of both bets. So he has won something like 115, lost 85, and then had a $30 expense in the form of takeout. You know, it's not how gambling transactions are thought of by lay people. I mean, I sort of go with the approach of, you know, I need to be able to explain my case to the grocery checkout clerk. And I think it's really hard to... Most of my conversations with the checkout clerks... They help simplify my arguments a little bit. Anyway, it's going to be hard to explain to that checkout clerk or your wife why a $100 bet isn't really a $100 bet. It's really a $85 bet and a $15 expense to go to the house. And to do that, then also that adds needless complexity for the casual gambler who doesn't get the benefit of this professional deduction. It's preferential tax treatment to the professional gambler, which I'm not sure there's much policy reasons behind that. You know, sometimes the answer is just the simplest one. And the taxpayer got the right answer in this case, and therefore we ask that you affirm. Okay. Any other questions? Thank you. So, counsel, you have a little rebuttal time. Thank you, Your Honors. And if I may clarify the structure of parimutel betting. Although it may be common parlance that bets are simple, the fact that parimutel is a little bit more complicated involves the fact that when Mr. Loncani enters a bet of $100 and the takeout is fixed at 20 percent, because the takeout percentage is fixed by race type and type of... And location of the bet, he knows the transaction he's entering to. So when he enters $100 at a 20 percent takeout, he's only losing $80 if he were to lose. And, sure, he may recover... Pocket's missing the other 22. And that 20 percent, Your Honor, is retained by the track. That is already part of the track, and it's not part of the wagering pool. And it's no longer wagered. And that's precisely what... Well, you know, it is part of the wagering pool, because they take the money out from the pool. I mean, it could be structured in such a way as that you pay a fee at the front end, but it's not. That's correct, Your Honor, but there is no substantive difference as to whether the fee is collected when he enters the track or when the bets... Sure there is, counsel, because he wouldn't have the fee if he didn't wager in the first place. He could go to the track and have dinner and watch the horses and do whatever else is going on, visit with people, never do a wager. He would never face this, would he? And that's correct, but that's precisely what the poker player invoiced faced. He wouldn't have been subjected to that fee had he not sat at the table and been subjected to a seat fee. Takeout percentage is precisely that, a fee that's collected that never enters a wagering transaction. Other questions by my colleagues? Thank you, Your Honor. Thank you very much, and the case just argued is submitted. The Court thanks these fine law students. We appreciate it. It's very unusual to have law students argue a tax case, I must say. But we compliment you. Thank you for your argument. I hope you found it not too grueling, and we also thank the government. And hold the mayo, okay? All right. As I said, the case just argued is submitted. We will now hear argument in the case of Perona v. Time Warner Cable.
judges: Schroeder, Clifton, M. Smith